**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION**

| | |
|---|---|
| BEATTIE B. ASHMORE, IN HIS ) <br> CAPACITY AS COURT-APPOINTED ) <br> RECEIVER FOR SCOTT A. KOHN, FUTURE ) <br> INCOME PAYMENTS, LLC, JOSEPH P. ) <br> HIPP, KRAIG S. AIKEN, AND DAVID N. ) <br> KENNEALLY, ) <br> ) <br>         Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ) <br> KARL NELSON AND SWORD AND SHIELD ) <br> FINANCIAL, L.C. d/b/a SWORD AND ) <br> SHIELD INSURANCE, ) <br> ) <br>         Defendants. ) | No. 6:20-cv-____-BHH <br><br><br><br> **COMPLAINT** <br> **JURY TRIAL DEMAND** |

The Receiver, Beattie B. Ashmore, ("Receiver") hereby files this Complaint and alleges as follows:

1. Plaintiff is the Court appointed Receiver in *In Re Receiver*, 6:19-cv-1112-BHH and has been tasked, *inter alia*, with locating, managing, recouping, and distributing the assets of the Scott A. Kohn ("Kohn")/Future Income Payments, LLC ("FIP") investment scheme associated with the criminal case of *United States v. Kohn, et al*, 6:19-cr-239-BHH.

2. Upon information and belief, Defendant Karl Nelson is a citizen of Utah.

3. Upon information and belief, Defendant Sword and Shield Financial, L.C. d/b/a Sword and Shield Insurance ("Sword and Shield") is a Utah limited liability company. Upon information and belief, Defendant Nelson is the sole and/or controlling member of Defendant Sword and Shield.

1

4.     The instant Complaint is so related to the *In Re Receiver*, 6:19-cv-1112-BHH case and the underlying criminal case, *United States v. Kohn, et al*, 6:19-cr-239-BHH that it forms part of the underlying case or controversy.

5.     The Receiver filed the Order of Appointment in the District of Utah, as well as the Central, Northern, Eastern and Southern District of California pursuant to 28 U.S.C. § 754 and venue is proper in the District of South Carolina.  Service of process will be accomplished pursuant to 28 U.S.C. §1692.

6.     Subject matter jurisdiction in this case is based upon 28 U.S.C. § 1331 and 1367(a).

## GENERAL ALLEGATIONS

7.     As a result of the indictment of Kohn and FIP,[1] an Order was entered on April 15, 2019, and was amended on April 30, 2019, July 18, 2019, and March 3, 2020 ("Court Order"), appointing Beattie B. Ashmore as the Receiver and setting forth the duties of the Receiver to include pursuing, seizing, marshaling and safeguarding the assets of Kohn, FIP, Hipp, Aiken, Kenneally and other so defined entities (hereinafter the "FIP Receivership Entities").

8.     Kohn was at all relevant times a prior convicted felon having served an active sentence in the United States Bureau of Prisons.  That information was available in the public domain.

9.     The Court Order, *inter alia*, includes the directive to bring suit for the disgorgement of moneys, including specifically instituting legal proceedings against individuals who are in unlawful and/or unjustified possession of moneys that flow from the Ponzi scheme

---

[1] A Superseding Indictment was returned by the grand jury on July 9, 2019, adding Joseph P. Hipp ("Hipp"), Kraig S. Aiken ("Aiken") and David N. Kenneally ("Kenneally") as Defendants.

orchestrated by Kohn, FIP and others. (*See* Court Order at Para. 2.)

10. On November 20, 2019, Aiken pled guilty to one count of conspiracy to commit wire and mail fraud related to the underlying criminal Ponzi scheme.

11. At all times, Defendants Nelson and Sword and Shield were agents for Paramount Financial Services, Inc. d/b/a Live Abundant.

12. To effectuate the fraudulent investment scheme, Kohn, through other persons (indicted and unindicted) and his company FIP, unlawfully purchased income streams from "Sellers" and recruited "Buyers" via fraudulent means to purchase the income streams.

13. Specifically, Sellers, most often veterans, were high debt, high credit risk individuals who were targeted by FIP and FIP Receivership Entities for cash advances and were solicited (and persuaded) to sell their future monthly pension streams for an amount that was far less than their value, essentially equating to a predatory lending practice. For example, in 2013, a Seller received $3,700.00 for an $18,000.00 pension stream that the Seller was then to pay back at $300.00 a month for 60 months.

14. These pension streams that were purchased by FIP were then sold to Buyers (investors) who were individuals who had qualified and unqualified investment funds. Buyers were solicited by unscrupulous insurance agents and/or wealth advisors who, based upon false and egregious misrepresentations to investors (such as promising guaranteed returns on their investment because they were backed by government pensions), convinced Buyers to rollover or place their current investment funds into the FIP investment product.

15. From the beginning, Buyers were generally told, informed and/or led to believe that the income stream from Sellers was government backed (insured), had been sanctioned by state and federal governments, and was protected by an adequately funded reserve account,

and that their investment dollars were going to help veterans via the loan funding mechanism, all of which is untrue.

16.     During the entire time of the operation, which began in 2011, the investment scheme was operated as a Ponzi scheme. Money from later Buyers (investors) was used to pay earlier Buyers. Upon information and belief, Defendants knew that Sellers defaulting on their agreed upon payments caused FIP to front payments due to Buyers with money from other Buyers- the classic marker of a Ponzi scheme.

17.     At all times, the approximate breakdown of moneys that flowed from Buyers was as follows: approximately ten percent was used to pay "commissions" for sale of the fraudulent investments; approximately twenty percent went to the actual "investment" platform (i.e. to fund the Seller advances or "loans"), and incredulously seventy percent went to Kohn/FIP and was not originally used as part of the funding mechanism.

18.     Seventy percent of the Buyer's money was retained and used by Kohn/FIP and others to do as they wished. This money was never used to meaningfully fund the reserve account. This money and all FIP accounts funded with this money were used to perpetuate the fraud and for Kohn's personal pleasure.  FIP used these funds each month to make up the difference between the total received from Sellers and the total due to Buyers.

19.     As the scheme progressed, Sellers began to default at higher rates on their payment obligations.  Many states issued cease and desist orders to FIP with regard to its illegal practice of purchasing income streams and the primary source of funds to pay investors therefore began to dwindle.  These "state enforcement actions" were known to the Defendants and not disclosed to the Buyers.  Over time, the very limited amount of Seller money that was being used to perpetuate the scheme evaporated and more and more of the

4

Buyers' money (i.e. money that was in the FIP accounts) was being used to pay other Buyers.

20. To effectuate the sale of the income streams, Kohn, through FIP and others, created a massive network of agents who received a commission for the sale of the FIP product. The total percentage of commissions paid on each sale ranged from five percent to eleven percent (5%-11%), and that amount was split among a number of individuals (for example, Joe Hipp, Ben Geber, David Valencia and many others) and agents, with some individuals receiving a percentage of every dollar brought into the scheme. The total commissions paid to agents exceeded tens of millions of dollars at the expense of hard-working individuals that were deceived.

21. Defendants were agents who worked with and/or for Paramount Financial Services, Inc. d/b/a Live Abundant ("Paramount") beginning in 2012 through at least March 2018. During his employment and with the assistance of Paramount, Defendants earned commissions for the sale of FIP products.

22. The services provided by agents, including Defendants, were illegal because they involved the sale of products (unregistered securities) that the agents were often not licensed to sell. The agents, including Defendants, had no Errors and Omissions coverage for such transactions.

23. Paramount and its agents were actively involved and engaged in selling unregistered securities in another Ponzi scheme (involving approximately $1.2 billion) run by Woodbridge Group of Companies, LLC ("Woodbridge"). Paramount and its agents began selling these securities around September 2015, even after regulatory actions against Woodbridge had been commenced. In some instances, Paramount and its agents sold both FIP and Woodbridge to the same investors. As an agent of Paramount, Defendants sold

5

Woodbridge and FIP to investors.

24. Paramount acted in concert and conspired with Kohn, FIP and others from the beginning and ultimately sold approximately one hundred thirty-four million dollars ($134,000,000.00) of FIP products and received at least eight million four hundred ninety-eight thousand five hundred thirteen dollars and seventeen cents ($8,498,513.17) in commissions. Paramount represented to investors that they sold approximately 80% of all FIP products.

25. Upon information and belief, beginning in or about 2012, Paramount, including Defendants, marketed the FIP products to their customers going so far as to encourage their customers to mortgage their homes to buy the product or liquidate their qualified retirement accounts.

26. Defendants are not licensed securities brokers and are not licensed to sell any products other than insurance products.

27. Additionally, Defendants were knowingly and intentionally selling unregistered securities, including the FIP products, in violation of section 5 of the Securities Act of 1933, as amended, and applicable state securities laws.

28. Defendants, through Paramount's marketing material and high-pressure seminar style information sessions, provided information that was false and misleading. Defendants either made these representations with knowledge of their falsity or with reckless disregard for the truth of the statements.

29. Upon information and belief, Defendants communicated false and misleading statements to Buyers and potential Buyers concerning the FIP products, or made statements that omitted material facts so as to make the statements misleading, including, but not limited

6

to, those recited elsewhere in this Complaint and the following:

    a. That FIP products were low risk with built in guarantees, when there was no reasonable basis for this statement;

    b. That the type of investment sold was secured by the government, when this was not true;

    c. That the risk of non-payment by a Seller was mitigated by a reserve account, when no reserve account existed at the time;

    d. That the FIP investment offered "good diversification," when this was not true;

    e. That borrowing against home equity to invest in FIP products was a wise strategy to develop wealth, when in fact, such a strategy was high-risk;

    f. That the FIP products were "Bernie Madoff proof," when in fact it was a Ponzi scheme known to one or more Defendants;

    g. That Sellers paid all fees, including Defendants' commissions; when in fact, investor funds were used to pay commissions;

    h. That Buyers could liquidate their FIP product investment back to Paramount if needed, when that was not an option;

    i. That because transactions went through an escrow account, investment risk was mitigated, when this was not true;

    j. That Defendants would give up part of their commission to increase the rate of return; and/or

    k. Multiple other false and misleading statements.

30.     Defendants sold FIP products to Buyers until the end of the criminal enterprise, all the time with the knowledge that numerous state and/or federal agencies had initiated actions

related to the FIP products. These governmental actions included investigations by states, including but not limited to Colorado, California, Massachusetts, North Carolina, New York, Washington, Iowa, Pennsylvania, Minnesota, Oregon, Illinois, Virginia, and Maryland, as well as the Consumer Financial Protection Bureau. In almost every case, FIP either entered into consent orders agreeing to no longer purchase pension income streams or the action resulted in cease and desist orders. Upon information and belief, with full knowledge of these actions and cease and desist orders, Defendants did not disclose such activities and investigations to potential Buyers of the FIP products. Further, even when Buyers inquired about information that was learned on the internet, Defendants did not disclose facts known to them and attempted to reassure Buyers and diminish or hide information learned by Buyers through independent due diligence.

31. Agents, in this case Defendants, who received commissions for the sale of FIP products, did so at the expense of those Buyers who lost part or all of their investment.

32. Defendants either failed to perform due diligence regarding Kohn, FIP and pension products in general, and/or actually knew, or were reckless in not knowing the criminal history of Kohn and the true facts surrounding the FIP products, and yet still aggressively marketed the FIP products to unwary investors. Defendants represented to Buyers that FIP had been thoroughly researched and was safe (although Kohn was a convicted felon, a fact easily learned from due diligence) and represented Kohn to be qualified and credible.

33. Upon information and belief, Defendants received at least four hundred thirty-two thousand forty-seven dollars and thirteen cents ($432,047.13) in commissions directly or indirectly from FIP related to a Ponzi scheme that is the subject of the underlying criminal indictment.

8

**FOR A FIRST CAUSE OF ACTION**
**(ACCOUNTING)**

34. Plaintiff alleges and incorporates herein by reference each and every allegation set forth in the preceding paragraphs, as if fully repeated herein.

35. As of the date of the filing of this Complaint, the Receiver has performed and continues to perform an investigation and analysis of the proceeds of the fraudulent investment offering and the activities of the Ponzi scheme and Defendants, including the payment of commissions to Defendants.

36. As a part of this investigation, the Receiver has endeavored to determine how much money was actually paid to each of the Defendants and to others with whom Defendants were working. Based on the information currently available to him, the Receiver has made an initial calculation and allocation of the amounts paid to Defendants.

37. The Receiver understands that the information available to him may be incomplete. Accordingly, the Receiver is entitled to and hereby demands an accounting from each of the Defendants, including the return of all moneys they received, directly or indirectly, in connection with their sale of FIP products or in connection with their work with the FIP Receivership Entities.

**FOR A SECOND CAUSE OF ACTION**
**(UNJUST ENRICHMENT/MONEY HAD AND RECEIVED)**

38. Plaintiff alleges and incorporates herein by reference each and every allegation set forth in the preceding paragraphs, as if fully repeated herein.

39. Defendants received commissions associated with the sale of products that were part of a criminal Ponzi scheme orchestrated and effectuated by Kohn, FIP and others. These commissions total at least four hundred thirty-two thousand forty-seven dollars and thirteen

9

cents ($432,047.13).

40. Defendants were the recipients of a non-gratuitous benefit from Kohn/FIP in that Defendants were the recipients and beneficiaries of commissions associated with the sale of an unorthodox, illegal investment product that was also part of a criminal Ponzi scheme.

41. Defendants appreciated and had knowledge of these benefits that were conferred on them by Kohn/FIP.

42. Payments to Defendants were made from the investments of other Buyers (investors).

43. Defendants have retained the benefit of these payments to the detriment of Buyers (investors) and the FIP Receivership Entities.

44. Defendants have no legitimate claim to the commissions because they were not licensed securities brokers and/or they were selling an unregistered security and it would be inequitable for Defendants to have accepted or to retain this benefit.  Defendants have received money to which the Receiver is in equity and good conscience entitled.

45. Defendants have been unjustly enriched and should repay Plaintiff at least four hundred thirty-two thousand forty-seven dollars and thirteen cents ($432,047.13) for the ultimate benefit of the Receivership estate and distribution to the Court-approved victims of the Ponzi scheme, in addition to whatever further amounts by which Defendants have been unjustly enriched.

**FOR A THIRD CAUSE OF ACTION**
**(FRAUDULENT TRANSFER: VIOLATION OF THE UTAH UNIFORM VOIDABLE TRANSACTIONS ACT, Utah Code Ann. § 25-6-101,** *et seq.* **AND/OR THE CALIFORNIA UNIFORM VOIDABLE TRANSACTIONS ACT, Civ. Code § 3439,** *et. seq.* **AND/OR OTHER APPLICABLE LAWS CONCERNING FRAUDULENT & VOIDABLE TRANSACTIONS)**

46. Plaintiff alleges and incorporates herein by reference each and every allegation set

forth in the preceding paragraphs, as if fully repeated herein.

47. Defendants were agents who received commissions for the sale of FIP products.

48. FIP was engaged in an enterprise that had all the characteristics of a Ponzi scheme.

49. Defendants received commissions in furtherance of the Ponzi scheme.

50. At the time Defendants were paid commissions, tens of millions of dollars were owed to Buyers (investors) of the FIP products in gross excess of the funds on hand. As such, at all times relevant hereto, the FIP Receivership Entities, including all of their affiliated entities and funds, were insolvent in that: (i) their liabilities exceeded the value of their assets by millions of dollars; (ii) they could not meet their obligations as they came due; and/or (iii) at the time of the transfers to Defendants described herein, the FIP Receivership Entities were left with insufficient capital to pay their investors and/or creditors.

51. Defendants received commission payments, directly or indirectly, from FIP (through the Ponzi scheme) and such payments were from investments made by Buyers (investors) and were made with the actual intent of hindering, delaying, or defrauding other Buyers (investors) participating in the Ponzi scheme.

52. Defendants gave nothing of value in exchange for their payments from FIP.

53. Defendants were not broker-dealers and/or agents licensed to sell FIP products and/or Defendants sold unregistered securities in violation of state and federal law.

54. Defendants' conduct made it possible for FIP to engage in a Ponzi scheme and Defendants knew or should have known that FIP was engaged in a Ponzi scheme.

55. The Receiver was only able to discover the fraudulent nature of the above-referenced transfers made by Kohn and his accomplices through the FIP Receivership Entities after Kohn and his accomplices were removed from control of the FIP Receivership Entities upon

the appointment of the Receiver. Moreover, the Receiver also had to undertake a time-consuming and extensive review of thousands upon thousands of paper and electronic documents relating to the FIP Receivership Entities to discover the fraudulent nature of the transfers. This action was brought within one year of the Receiver's appointment. The Receiver's investigation is still ongoing. No amount of reasonable diligence by the Receiver could have detected the transfers sooner. As a result, there may be evidence of other assets belonging to the Receivership Estate or other fraudulent transfers of funds that the Receiver has yet to discover. If such transfers or assets are later discovered, the Receiver will seek to amend this Complaint and/or his theories to assert all possible claims regarding such transfers or assets, including by alleging violation of laws that may be determined to apply to the facts of this case upon discovery and further investigation.

56. Payments to or for the benefit of Defendant in the amount of at least four hundred thirty-two thousand forty-seven dollars and thirteen cents ($432,047.13) should be voided and should be repaid to the Plaintiff pursuant to Utah Uniform Voidable Transactions Act, Utah Code Ann. § 25-6-101 *et seq*. (including any such predecessor acts and laws), the California Uniform Voidable Transactions Act, Civ. Code § 3439, *et seq.* (including any such predecessor acts and laws), and any other applicable laws that, after discovery and further investigation, are determined to apply to the facts of this case concerning voiding of fraudulent transfers and transactions.

WHEREFORE, Plaintiff prays for an accounting from each of the Defendants, including the return of all moneys they received, directly or indirectly, in connection with their sale of FIP products or in connection with their work with the FIP Receivership Entities; a judgment ordering return of at least four hundred thirty-two thousand forty-seven

dollars and thirteen cents ($432,047.13), interest as allowed by law, as may be permitted, and for his costs, reasonable attorneys' fees, and such other and further relief as the Court may deem just and proper, including but not limited to all applicable pre-judgment and post-judgment interest and disbursements of this action.

Respectfully submitted,

**THE TOLLISON LAW FIRM, P.A.**

/s/L. Walter Tollison, III
L. Walter Tollison, III
Federal Bar No. 4117
Walt.tollison@thetollisonlawfirm.com
/s/Lauren S. Price
Lauren S. Price
Federal Bar No. 10406
Lauren.price@thetollisonlawfirm.com

18 B Markley Street
Greenville, South Carolina 29601
Phone: (864) 451-7038
Fax:    (864) 451-7591

**VANDERBLOEMEN LAW FIRM, P.A.**

Thomas E. Vanderbloemen
Federal Bar No. 9858
tom@vanderbloemenlaw.com
330 East Coffee Street
Greenville, South Carolina 29601
Phone: (864) 250-9530

*Attorneys for the Receiver*

April 14, 2020
Greenville, South Carolina